# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
September 5, 2018 Session

## STATE OF TENNESSEE v. SHARRAD SHARP

**Appeal from the Criminal Court for Shelby County**
No. 15-00284      Carolyn W. Blackett, Judge

_____

### No. W2018-00156-CCA-R3-CD
_____

The Appellant, Sharrad Sharp, was convicted in the Shelby County Criminal Court of one count of aggravated child abuse of a child eight years of age or less, a Class A felony; two counts of aggravated child neglect of a child eight years of age or less, a Class A felony; one count of aggravated sexual battery of a child less than thirteen years of age, a Class B felony; three counts of aggravated assault, a Class C felony; and two counts of child abuse of a child eight years of age or less, a Class D felony. After a sentencing hearing, he received an effective thirty-seven-year sentence. On appeal, the Appellant contends that six of the twenty-five counts of the indictment are void because they failed to state an offense, that it was plain error for the State to play the victims' forensic interviews in their entirety for the jury and introduce those interviews into evidence, that the evidence is insufficient to support the convictions, and that the trial court abused its discretion by ordering consecutive sentencing. The State acknowledges that six of the convictions should be vacated because the indictment failed to provide the Appellant with adequate notice. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the Appellant's convictions of aggravated child abuse in count one, aggravated child neglect in counts five and six, and aggravated assault in counts two, seven, and eight must be reversed and vacated and the charges dismissed because the indictment failed to provide the Appellant with adequate notice of the offenses charged. The Appellant's remaining convictions of aggravated sexual battery in count seventeen and child abuse in counts eighteen and nineteen and the resulting effective sixteen-year sentence are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed and Vacated in Part**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT H. MONTGOMERY, JR., JJ., joined.

Lance R. Chism (on appeal) and Patience Branham (at trial), Memphis, Tennessee, for the appellant, Sharrad Sharp.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Gavin Smith and Sarah Poe, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

This case relates to the Appellant's abusing his four children, whom we will refer to as A.S., B.S., C.S., and D.S.[1] In January 2015, the Shelby County Grand Jury returned a twenty-five count indictment against the Appellant. According to the cover sheet for the indictment, the grand jury charged him with four counts of aggravated child abuse, twelve counts of aggravated child neglect, one count of aggravated sexual battery, and eight counts of child abuse. Subsequently, the State dismissed four counts of aggravated child neglect and six counts of child abuse and proceeded to trial on the remaining charges: two counts of aggravated child abuse of a child eight years of age or less in which the named victim was B.S.; four counts of aggravated child neglect of a child eight years of age or less in which the named victim was B.S.; two counts of aggravated child abuse of a child eight years of age or less in which the named victim was D.S.; four counts of aggravated child neglect of a child eight years of age or less in which the named victim was D.S.; one count of aggravated sexual battery of a child less than thirteen years of age in which the named victim was A.S.; and two counts of child abuse of a child eight years of age or less in which the named victim was C.S.

At the Appellant's September 2017 trial, Rita Philmore, the children's maternal grandmother, testified that in 2014, the four children were living with her. One time, Philmore and A.S. were watching a movie in which a little girl was assaulted. Philmore saw tears on A.S.'s face and asked why she was crying. A.S. told Philmore about an incident that happened at A.S.'s uncle's house. As a result of Philmore's conversation with A.S., Philmore talked with A.S.'s two younger sisters, B.S. and C.S. Philmore contacted the Department of Children's Services (DCS) and ultimately received custody of A.S., B.S., C.S., and their brother, D.S.

---

[1] It is the policy of this court to refer to minor victims by their initials. However, because all of the victims' first names start with the same letter, we will refer to their first names by using the first four letters of the alphabet for clarity. We mean no disrespect to the victims.

On cross-examination, Philmore testified that at the time of the movie, A.S. was eleven years old, B.S. was eight, C.S. was five, and D.S. was two. The Appellant was Philmore's daughter's boyfriend and the children's father. Philmore acknowledged that prior to her contacting DCS, she was very close to the children and that they often stayed with her. She said that the children were "basically homeless" and that that they were afraid of the Appellant. However, Philmore never witnessed anything inappropriate between the Appellant and the children. She denied that the Appellant was ever her boyfriend.

On redirect examination, Philmore testified that she reported her daughter and the Appellant to DCS "a lot." On one occasion, she reported them to DCS because A.S. had bruises all over her body. Philmore said she and her husband usually had to take food to the children because they did not have anything to eat. On recross-examination, Philmore denied that she had always wanted custody of the children. She said that she was not trying to take the children away from their parents but that she was trying to protect them.

C.S. testified that she was born in May 2008, that she was nine years old, and that she was in the fourth grade. She said she knew the difference between the truth and a lie. When C.S. was five years old, her family lived in the Clementine Apartments. Her family included her mother; her "stepdad," who was the Appellant; her two sisters, A.S. and B.S.; and her brother, D.S. She said that she and D.S. used to take baths together and that one time, she saw the Appellant "drowning [D.S.] under the water." When the Appellant lifted D.S.'s head out of the water, D.S. was crying. C.S. said the incident made her sad and scared. C.S. said that another time, the Appellant hit her face with a shoe because she had pushed D.S. off the bed. A roach was on the bottom of the shoe, and some of the roach got onto C.S.'s face. On another occasion, the Appellant hung B.S. upside down on a doornail and hit her back three times with a belt. C.S. said she also saw the Appellant hold D.S. by D.S.'s leg over the railing outside their apartment. Their apartment was on the third floor, and the Appellant dropped D.S.

On cross-examination, C.S. testified that she considered the Appellant to be her father. She said that she did not love him but that she was not afraid of him. C.S. stated that she did not know when all of the incidents occurred and that no one told her to say the Appellant committed the abuse. She acknowledged that she used to see a counselor and that she and her counselor talked "about all of this." C.S. also talked with the prosecutors and her grandmother about the abuse.

B.S. testified that she was born in April 2005, that she was twelve years old, and that she was in the seventh grade. When B.S. was eight years old, her family lived in the Clementine Apartments or at her uncle's house. Her family included her mother; her

"dad," who was the Appellant; her two sisters, A.S. and C.S.; and her brother, D.S. B.S. said that she "remember[ed] going through hurtful stuff" while they lived in the Clementine Apartments and that the Appellant abused her "a lot." The Appellant "hanged [her] on the door" and "whoop[ed] her with a belt" while she was hanging on the door. The State asked if the whipping hurt, and she said yes. She said it also made her angry. One time, B.S. saw the Appellant take A.S. into the bathroom. The bathroom door was cracked open, so B.S. looked into the bathroom. The State asked what B.S. saw, and she answered, "He was -- I'm not sure. I think he had his hand or his head in her middle part." She acknowledged that by "middle part," she meant between A.S.'s legs. B.S. saw the Appellant shove D.S.'s head under water and hold it there. She said that the Appellant was laughing and that the incident made her sad. B.S. also saw the Appellant pulling on D.S.'s "middle part" and laughing about it. B.S. said that the Appellant mostly abused her as opposed to the other children and that he would hit her across the face and throw her across the room. He also forced her to drink beer, and she saw him give beer to her three siblings

On cross-examination, B.S. testified that the Appellant was her father, not her stepfather. Defense counsel asked, "Who told you to use the word 'abuse?'" She answered, "Myself." She said that "punishment" was different from "abuse" and that "['abuse' is] like someone beating on you or hurting you." Defense counsel asked B.S. when the abuse occurred, and she answered, "I guess since I was four." She said that some of the abuse may have occurred when the family lived at her uncle's house. B.S.'s mother did not abuse her. Her mother would tell the Appellant to stop, but he would not. B.S. said that she talked with her grandmother, someone at the Child Advocacy Center (CAC), and the prosecutor about the abuse.

A.S. testified that she was in the ninth grade,[2] and she identified the Appellant as her father. When A.S. was ten or eleven years old and in the fourth grade, her family lived in the Clementine Apartments in Memphis. She recalled an incident in which the Appellant "hung [B.S.] on a door by her foot." B.S. was hanging upside down on the door and "got a whooping." The Appellant also "beat" A.S.'s sisters and her mother with his hand or objects around the apartment. Most of the time, though, he hit them with his hand. The Appellant hit C.S. with a shoe and forced D.S.'s head underwater when D.S. was in the bathtub. D.S. was two years old at the time of the incident and was crying.

A.S. testified that when she was in the fifth grade, her family lived at her uncle's house in Millington. She said that one day, her mother called her to the back of the house and told her that the Appellant was going to shave her vaginal area. A.S. went into the

_____

[2] The record reflects that A.S. was born on October 30, 2002. Therefore, she would have been almost fifteen years old at the time of the Appellant's September 2017 trial.

- 4 -

bathroom and got into the shower, and the Appellant came into the bathroom. He asked her if she already shaved herself. A.S. had never shaved her vaginal area before, so she told him no. The Appellant left the bathroom but returned and asked her again if she shaved herself. She again told him no. A.S. said she remembered "standing back in front of the sink and like he stood behind me and like opened the back of my towel and tried to fix it." She then recalled "sitting on the toilet" and the Appellant "having the razor in his hand." A.S. was scared and told the Appellant that she "knew how to do it." The Appellant gave her the razor, and she tried to shave her vaginal area. However, the Appellant told her that she "wasn't doing it right." The Appellant took the razor from her and began shaving her. A.S. started crying, so the Appellant had her put her "dry off" towel over her face. At some point, the Appellant moved A.S. onto the floor. A.S. was lying on her back, and her legs were "open," exposing her vaginal area. She said she could see that the Appellant had the razor in one hand and a telephone in the other hand. When he finished shaving her, A.S. felt his thumb or index finger touch her vaginal area. The State asked if he touched the inside or the outside of her vaginal area, and she answered, "It was like insidewise. Like, yeah, around the inside area."

A.S. testified that she was "uncomfortable and scared" throughout the incident and that she went to bed crying. The Appellant came into her bedroom and noticed she was crying. She said he "laid behind [her]" and put his arm around her. The State asked, "Is that something he would usually do?" A.S. answered, "Not like -- not in that way." She said that the Appellant would give her wine and that she saw him give wine or beer to her siblings. One time while they still lived in the Clementine Apartments, A.S. saw the Appellant hold D.S. by his ankles over the railing outside their apartment door. Their apartment was on the third floor, and A.S. was scared.

On cross-examination, A.S. testified that she thought the shaving incident was sexual abuse because she knew it "wasn't right." Her grandmother was the first person she told about the incident, and she also talked with a counselor at the CAC. A.S. said that she did not know if photographs had been taken of any abuse and that she had never seen any photographs of her private parts. Regarding the incident in which the Appellant held D.S.'s head underwater, A.S. and the Appellant were the only people in the bathroom to witness the incident. However, B.S. and C.S. may have been standing in the hallway. A.S. said that the Appellant never dropped D.S. over the railing outside the apartment and that C.S. was wrong if C.S. said the Appellant dropped D.S. A.S. said that she had been living with her grandmother for the past several years and denied that her grandmother told her what to say during her testimony. She said that she did not know if she loved the Appellant but that she was not afraid of him. On redirect examination, A.S. testified that she was not always in the bathroom with D.S. when he took a bath.

- 5 -

Letitia Cole, a forensic interviewer at the CAC, testified that she interviewed A.S. about the abuse. The March 6, 2014 interview was video recorded, and the State played the recording for the jury. During A.S.'s interview, she told Cole that she was eleven years old and currently lived with her grandparents, her brothers and sisters, and a cousin. She said that when she lived with her mother and the Appellant, the Appellant "choked" and "beat" her and her siblings. He also kicked A.S.'s back. One time, the Appellant hung B.S. on a door by her legs and whipped her with a belt. On another occasion, A.S. saw the Appellant hit C.S.'s face with a "house shoe" because C.S. made D.S. fall off the bed. A.S. said that the Appellant whipped A.S. with a belt and that she had bruising on her arms, back, and legs. The Appellant last whipped her about one year ago.

Regarding the shaving incident, A.S. told Cole that it occurred when she was ten years old and the family lived at her uncle's house. Her mother called her to the back of the house and told her that the Appellant had to shave her. Cole asked A.S. where the Appellant was going to shave her, and A.S. said her vagina. The Appellant instructed A.S. to go into the bathroom, pull down her pants, and sit on the toilet. A.S. did as she was told and was crying. She did not want the Appellant to shave her and told him, "I got it." She took the razor from him and began shaving herself, and the Appellant told her, "That's not how you do it." The Appellant had A.S. put a towel over her face, and A.S. felt him shaving her. She could see that he was holding a black Samsung telephone and that he was using the telephone to take photographs of her "down there" while he was shaving her. A.S. kept crying, so the Appellant made her get onto the floor. A.S.'s legs were open, and she could see that the Appellant was continuing to take photographs of her. Cole asked A.S., "Did you feel anything else going on besides him shaving you?" A.S. said she felt the Appellant touch her vaginal area with his finger. After the incident, A.S. went into her bedroom. The Appellant laid down beside her, put his arm around her, and told her, "Since your mom isn't here, I have to teach you how to be a lady."

A.S. told Cole about an incident that occurred when the family lived at her uncle's house. A.S. said she was taking a shower when the Appellant came into the bathroom and told her to get out of the bathtub so he could show her how to lock the bathroom door. A.S. got out of the shower and had a towel around her. She said that the Appellant tried to "fix" her towel and that she felt him touching her. Cole asked where the Appellant was touching her, and A.S. answered, "He was trying to fix my towel." A.S. said that on a separate occasion, the Appellant gave her and her sisters wine. The next day, the Appellant forced D.S. to drink beer.

Teresa Onry, a forensic interviewer at the CAC, testified that she interviewed B.S. and C.S. The April 7, 2014 interviews were video recorded, and the State played the recordings for the jury. During B.S.'s interview, she told Onry that she currently lived with her grandparents, brothers, sisters, and a cousin. When she lived with her mother

and the Appellant, the Appellant was "always bruising us." He also threw the children across the room and choked them. The Appellant would "squeeze" D.S.'s "weenie," pull on it, and laugh. B.S. said she saw the Appellant push D.S.'s head underwater when D.S. was in the bathtub. She explained that the incident occurred when she got home from school and that the bathroom door was open. B.S. told Onry that the Appellant would pick her up by her neck and throw her across the room. One time, he used a belt to hang her upside down on a door and "whooped" her. On another occasion, he used the belt to hang her on the door by her neck. Onry asked about the location of the door, and B.S. said that both incidents occurred on the front door of their apartment and that the Appellant hung her outside the apartment. The Appellant gave all of the children alcohol and blew smoke in their faces.

During C.S.'s interview, she told Onry that one time when she was in the bathtub with D.S., the Appellant pushed D.S.'s head underwater. On another occasion, the Appellant hung B.S. on "a doorknob" by her shirt. C.S. said that B.S.'s head was "on the ground" and that the Appellant used his belt to whip B.S.'s "tummy." C.S. said that the Appellant would "whoop" C.S. with the belt and that one time, her leg was bleeding. On a separate occasion, the Appellant hit C.S. with a shoe that had a bug on it. The Appellant gave C.S. and D.S. wine, and he gave all of the children beer. C.S. said that one time when they lived at her uncle's house, the Appellant "peeked" under the bathroom door while A.S. was in the bathtub. The Appellant told A.S. to get out of the bathtub and asked A.S., "Do you want me to shave your underarms?" A.S. got out of the bathtub and had a towel around herself. C.S. said that the Appellant did not shave A.S. but that he was behind A.S. and was teaching A.S. how to lock the bathroom door.

At the conclusion of Onry's testimony, the State rested its case. The trial court instructed the jury on aggravated child abuse of B.S. in counts one and two; aggravated child neglect of B.S. in counts five through eight; aggravated child abuse of D.S. in counts nine and ten; aggravated child neglect of D.S. in counts thirteen through sixteen; aggravated sexual battery of A.S. in count seventeen; and child abuse of C.S. in counts eighteen and nineteen. After instructing the jury, the trial court announced the following election of offenses: counts one, two, five, six, seven, and eight related to the Appellant's hanging B.S. on the door by her feet and whipping her when she was eight years old and lived in the Clementine Apartments; counts nine, ten, thirteen, fourteen, fifteen, and sixteen related to the Appellant's forcing D.S.'s head underwater when he was two years old and lived in the Clementine Apartments; count seventeen related to the Appellant's shaving A.S.'s vaginal area and placing his hand on the inside of her vagina when she was ten or eleven years old and lived at her uncle's house; and counts eighteen and nineteen related to the Appellant's hitting C.S.'s face with a shoe when she was five years old and lived in the Clementine Apartments.

The jury found the Appellant guilty of aggravated child abuse of B.S. as charged in count one; guilty of aggravated assault of B.S. as a lesser-included offense of aggravated child abuse in count two; guilty of aggravated child neglect of B.S. as charged in counts five and six; guilty of aggravated assault of B.S. as a lesser-included offense of aggravated child neglect in counts seven and eight; not guilty of aggravated child abuse of D.S. in counts nine and ten; not guilty of aggravated child neglect of D.S. in counts thirteen through sixteen; guilty of aggravated sexual battery of A.S. as charged in count seventeen; and guilty of child abuse of C.S. as charged in counts eighteen and nineteen. After a sentencing hearing, the trial court imposed an effective thirty-seven-year sentence.

## II. Analysis

### A. Indictment

The Appellant contends that counts one, two, five, six, seven, and eight of the indictment are void for failing to state an offense. The State acknowledges that the Appellant's convictions in those six counts should be vacated. We agree with the Appellant and the State and conclude that the Appellant's convictions of aggravated child abuse in count one, aggravated child neglect in counts five and six, and aggravated assault in counts two, seven, and eight must be reversed and vacated and the charges dismissed because the indictment failed to provide the Appellant with adequate notice of the offenses charged.

Initially, we note that the State claims we must review this issue for plain error because the Appellant failed to raise it before trial or in his motion for new trial. See Tenn. R. App. 36(a); Tenn. R. App. P. 3(e). The Appellant concedes that he did not raise this issue previously and notes that our supreme court "recently questioned whether a jurisdictional attack on an indictment can be raised for the first time on appeal." See State v. Duncan, 505 S.W.3d 480, 489 n.10 (Tenn. 2016). However, at this time, mandatory authority provides that a defendant cannot waive objections to a lack of subject matter jurisdiction or the failure of an indictment to charge an offense. State v. Nixon, 977 S.W.2d 119, 121 (Tenn. Crim. App. 1997). In fact, a defendant may raise such challenges for the first time in a petition for post-conviction relief. See John Smith v. State, No. W2015-00633-CCA-R3-PC, 2016 WL 3345247, at *7 (Tenn. Crim. App. at Jackson, May 27, 2016). Therefore, the Appellant did not waive the issue.

The Sixth and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Tennessee Constitution afford an accused the right to be informed of the nature and cause of the accusation against him or her. See State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). Generally, a charging instrument is valid if the

information contained therein "provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." Id. With the decline of common law offenses and the advent of statutory offenses, strict pleading requirements are no longer necessary. Id. at 727-28. "Hill and its progeny leave little doubt that [charging instruments] which achieve the overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000). Moreover, "specific reference to a statute within [a charging instrument] may be sufficient to place the accused on notice of the charged offense." State v. Sledge, 15 S.W.3d 93, 95 (Tenn. 2000); see also State v. Carter, 988 S.W.2d 145, 149 (Tenn. 1999). The validity of an indictment is a question of law and, therefore, our review is de novo. Hill, 954 S.W.2d at 727.

The statute governing aggravated child abuse, aggravated child neglect, and aggravated child endangerment provides that

> (a) A person commits the offense of aggravated child abuse, aggravated child neglect or aggravated child endangerment, who commits child abuse, as defined in § 39-15-401(a); child neglect, as defined in § 39-15-401(b); or child endangerment, as defined in § 39-15-401(c) and:
>
> (1) The act of abuse, neglect or endangerment results in serious bodily injury to the child;
>
> (2) A deadly weapon, dangerous instrumentality, controlled substance or controlled substance analogue is used to accomplish the act of abuse, neglect or endangerment;
>
> (3) The act of abuse, neglect or endangerment was especially heinous, atrocious or cruel, or involved the infliction of torture to the victim; or
>
> (4) The act of abuse, neglect or endangerment results from the knowing exposure of a child to the initiation of a process intended to result in the manufacture of methamphetamine as described in § 39-17-435.

Tenn. Code Ann. § 39-15-402. Child abuse occurs when "[a]ny person . . . knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a

- 9 -

manner as to inflict injury." Tenn. Code Ann. § 39-15-401(a).[3] Child neglect occurs when "[a]ny person . . . knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare." Tenn. Code Ann. § 39-15-401(b).[4] Child endangerment occurs when "[a] parent or custodian of a child eight (8) years of age or less . . . knowingly exposes such child to or knowingly fails to protect such child from abuse or neglect resulting in physical injury or imminent danger to the child. Tenn. Code Ann. § 39-15-401(c).

We will now consider whether counts one, two, five, six, seven, and eight of the indictment are void for failing to provide the Appellant with adequate notice of the offenses charged. The following table summarizes the Appellant's convictions:

| Count | Victim | Offense on Cover Page of Indictment | Jury's Verdict | Conviction on Judgment Form |
|---|---|---|---|---|
| 1 | B.S. | Aggravated Child Abuse | Aggravated Child Abuse | Aggravated Child Abuse |
| 2 | B.S. | Aggravated Child Abuse | Aggravated Assault | Aggravated Assault |
| 5 | B.S. | Aggravated Child Neglect | Aggravated Child Neglect | Aggravated Child Endangerment |
| 6 | B.S. | Aggravated Child Neglect | Aggravated Child Neglect | Aggravated Child Endangerment |
| 7 | B.S. | Aggravated Child Neglect | Aggravated Assault | Aggravated Assault |
| 8 | B.S. | Aggravated Child Neglect | Aggravated Assault | Aggravated Assault |
| 17 | A.S. | Aggravated Sexual Battery | Aggravated Sexual Battery | Aggravated Sexual Battery |

---

[3] Child abuse committed on a child less than eighteen years old is a Class A misdemeanor, whereas child abuse committed on a child eight years of age or less is a Class D felony. Tenn. Code Ann. § 39-15-401(a). Aggravated child abuse committed on a child less than eighteen years old is a Class B felony, whereas aggravated child abuse committed on a child eight years of age or less is a Class A felony. Tenn. Code Ann. § 39-15-402(b).

[4] Child neglect committed on a child less than eighteen years old is a Class A misdemeanor, whereas child neglect committed on a child eight years of age or less is a Class E felony. Tenn. Code Ann. § 39-15-401(b). Aggravated child neglect committed on a child less than eighteen years old is a Class B felony, whereas aggravated child neglect committed on a child eight years of age or less is a Class A felony. Tenn. Code Ann. § 39-15-402(b).

| 18 | C.S. | Child Abuse | Child Abuse | Child Abuse |
| 19 | C.S. | Child Abuse | Child Abuse | Child Abuse |

Count One

The cover sheet for the indictment listed count one as "aggravated child abuse." Count one of the indictment alleged that the Appellant:

> between July 15, 2011 and March 14, 2014 in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully and knowingly, other than by accidental means, treat [B.S.], a child eight (8) years of age or less, so as to adversely affect the health and welfare of the said child, such act being especially heinous, atrocious or cruel, in violation of [Tennessee Code Annotated] 39-15-402, against the peace and dignity of the State of Tennessee.

As noted by the Appellant, although the cover sheet for the indictment listed count one as "aggravated child abuse," the indictment did not allege that he treated B.S. in such as manner as to inflict injury, which is an element of child abuse. Instead, the indictment alleged that he treated her in such a manner as to affect her health and welfare, which is an element of child neglect. We acknowledge that a minor discrepancy between the language on the cover sheet and the language contained in a count of the indictment will not render the indictment void. See Jermaine Gwin v. State, No. W2014-00681-CCA-R3-HC, 2015 WL 12978199, at *2 (Tenn. Crim. App. at Jackson, Jan. 16, 2015). However, the offenses specified on the cover sheet may be considered in determining whether the indictment sufficiently notified the defendant of the specific charges he would have to defend. See Joseph R. Wiggins v. State, No. W2008-02630-CCA-R3-HC, 2009 WL 4586550, at *5 (Tenn. Crim. App. at Jackson, Dec. 7, 2009). Moreover, the parties in this case referred to count one as "aggravated child abuse" throughout the trial, the trial court advised the jury during the jury instructions that the Appellant was charged in count one with "aggravated child abuse," and the jury pronounced the Appellant guilty of "aggravated child abuse." The reference to Tennessee Code Annotated section 39-15-402 in count one was of no assistance because that statute defines both aggravated child abuse and aggravated child neglect. Therefore, we agree with the Appellant and the State that count one of the indictment failed to put him on notice as to which offense he must defend against, aggravated child abuse or aggravated child neglect. Accordingly his conviction of aggravated child abuse in count one must be reversed and vacated and that charge dismissed.

- 11 -

Count Two

The cover sheet for the indictment also listed count two as "aggravated child abuse." Count two of the indictment alleged that the Appellant:

> between July 15, 2011 and March 14, 2014 in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully and knowingly, other than by accidental means, treat [B.S.], a child eight (8) years of age or less, so as to adversely affect the health and welfare of the said child, and such act involved the infliction of torture, in violation of [Tennessee Code Annotated] 39-15-402, against the peace and dignity of the State of Tennessee.

As with count one, the indictment for count two did not allege that the Appellant treated B.S. in such as manner as to inflict injury, which is an element of child abuse, but instead alleged that he treated her in such a manner as to affect her health and welfare, which is an element of child neglect. Moreover, the cover sheet for the indictment listed count two as "aggravated child abuse," the parties referred to count two as "aggravated child abuse" throughout the trial, and the trial court advised the jury during the jury instructions that the Appellant was charged in count two with "aggravated child abuse." As with count one, the reference to Tennessee Code Annotated section 39-15-402 was of no assistance because that statute defines both aggravated child abuse and aggravated child neglect. Therefore, we agree with the Appellant and the State that count two of the indictment also failed to put him on notice as to which offense he must defend against. Accordingly, his conviction of aggravated assault as a lesser-included offense of aggravated child abuse in count two must be reversed and vacated and that charge dismissed.

Counts Five, Six, Seven, and Eight

The cover sheet for the indictment listed counts five, six, seven, and eight as "aggravated child neglect." Count five of the indictment alleged that the children's mother and the Appellant:

> between July 15, 2011 and March 14, 2014 in Shelby County, Tennessee, and before the finding of this indictment, did, being the parent of [B.S.], a child eight (8) years of age or less, unlawfully and knowingly expose the said [B.S.], to abuse or neglect, such act being especially heinous, atrocious or cruel, in violation of [Tennessee Code Annotated] 39-15-402, against the peace and dignity of the State of Tennessee.

- 12 -

Count six of the indictment alleged that the children's mother and the Appellant:

> between July 15, 2011 and March 14, 2014 in Shelby County, Tennessee, and before the finding of this indictment, did, being the parent of [B.S.], a child eight (8) years of age or less, unlawfully and knowingly fail to protect the said [B.S.] from abuse or neglect, such act being especially heinous, atrocious or cruel, in violation of [Tennessee Code Annotated] 39-15-402, against the peace and dignity of the State of Tennessee.

Count seven of the indictment alleged that the children's mother and the Appellant:

> between July 15, 2011 and March 14, 2014 in Shelby County, Tennessee, and before the finding of this indictment, did, being the parent of [B.S.], a child eight (8) years of age or less, unlawfully and knowingly expose the said [B.S.] to abuse or neglect, and such act involved the infliction of torture, in violation of [Tennessee Code Annotated] 39-15-402, against the peace and dignity of the State of Tennessee.

Count eight of the indictment alleged that the children's mother and the Appellant:

> between July 15, 2011 and March 14, 2014 in Shelby County, Tennessee, and before the finding of this indictment, did, being the parent of [B.S.], a child eight (8) years of age or less, unlawfully and knowingly fail to protect the said [B.S.] from abuse or neglect, and such act involved the infliction of torture, in violation of [Tennessee Code Annotated] 39-15-402, against the peace and dignity of the State of Tennessee.

Counts five, six, seven, and eight of the indictment used some language for the offense of aggravated child endangerment. Specifically, counts five and seven alleged that the defendants knowingly exposed B.S. to abuse or neglect, and counts six and eight alleged that they knowingly failed to protect her. Curiously, someone even wrote "Agg child endangerment" as the indicted offense on all four judgment forms and then wrote "as charged" as the conviction offense on the judgment forms in counts five and six. However, the cover sheet for the indictment listed all four counts as "aggravated child neglect," the parties referred to all four counts as "aggravated child neglect" throughout the trial, the trial court advised the jury during the jury instructions that the Appellant was charged in all four counts with "aggravated child neglect," and the jury pronounced him guilty of "aggravated child neglect" in counts five and six and aggravated assault as a lesser-included offense of aggravated child neglect in counts seven and eight. The language in counts five, six, seven, and eight of the indictment, though, did not allege that

- 13 -

the Appellant abused or neglected B.S. so as to adversely affect her health and welfare, an element of aggravated child neglect. Therefore, we agree with the Appellant and the State that the indictment failed to put him on notice as to which offenses he must defend against. Accordingly, his convictions of aggravated child neglect in counts five and six and aggravated assault as a lesser-included offense of that offense in counts seven and eight must be reversed and vacated and those charges dismissed.

In sum, six of the Appellant's nine convictions must be reversed and vacated because the indictment failed to provide the Appellant with adequate notice of the offenses charged. We note that during a jury-out discussion regarding the jury instructions, the State made comments to the trial court that demonstrated the State was aware of problems with the indictment. Preparation of an indictment is the responsibility of the office of the district attorney general. As in all cases, the district attorney general signs each count of an indictment. Therefore, the district attorney general has approved the language of each count in the indictment and has, at a minimum, implicitly warranted that the count correctly and adequately meets the liberal standards to provide notice of what criminal offense is alleged.

We have no knowledge of who reviews indictments in the Shelby County District Attorney's Office prior to the indictments being presented to the Shelby County Grand Jury. Likewise, we are unaware of the procedures in that office to prevent a case from proceeding in the trial court with such a sloppily prepared indictment.

Attention to detail is important, and the lack thereof in this case is perplexing to this court. The indictment was returned by the grand jury on January 15, 2015. The trial began on September 25, 2017. The State's prosecutors had two years and eight months before trial to read the indictment and make sure the language was correct. This court is well-aware that the statutes regarding child abuse, child neglect, and child endangerment are complex and require careful analysis to determine which offense applies to the facts in any given case. Neither the courts nor the district attorneys general wrote the statutes - that was done by the General Assembly. However, it is squarely the responsibility of the district attorneys general in this state to ensure that indictments are properly drafted.

### B. Forensic Interviews

Next, the Appellant contends that the trial court erred by allowing the State to play the victims' forensic interviews in their entirety for the jury and introduce those interviews into evidence. The Appellant acknowledges that we must review this issue for plain error because he failed to raise it in his motion for new trial. See Tenn. R. App. P. 3(e). The State argues that the interviews were properly admitted as prior consistent statements. We agree with the State.

Prior to Letitia Cole's testimony, defense counsel objected to the State's admitting A.S.'s, B.S.'s, and C.S.'s forensic interviews into evidence, contending that the interviews were being admitted to bolster their testimony. Defense counsel also claimed that the interviews were inadmissible because the children discussed incidents of abuse in the interviews that they did not discuss during their trial testimony. The State argued that the interviews were admissible as prior consistent statements pursuant to State v. Albert R. Neese, No. M2005-00752-CCA-R3-CD, 2006 WL 3831387, at *6 (Tenn. Crim. App. at Nashville, Dec. 15, 2006), because defense counsel had attacked the children's credibility. The State advised the court that it had redacted "instances that were not covered in the indictment as they're not relevant to this case."

The trial court gave defense counsel ten minutes to review the redacted versions of the interviews. After the ten-minute break, the court recessed for lunch. When the parties returned to the courtroom, the trial court asked if they were ready to proceed, and defense counsel did not raise any further objections to the forensic interviews. During Cole's and Teresa Onry's testimony, the State played the three recorded forensic interviews for the jury and introduced the recordings into evidence. The State advised the jury that certain parts of the interviews had been redacted because they were not relevant to the case and that "[n]o one is trying to hide anything. We have done that by agreement." The trial court added, "So there's nothing that we are hiding from you that you need to know. It's just that the facts are not relevant to this case."

In State v. Benton, 759 S.W.2d 427, 433-34 (Tenn. Crim. App. 1988), this court explained as follows:

> [U]nder general evidentiary rules, prior consistent statements may be admissible, as an exception to the rule against hearsay, to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied. But before prior consistent statements become admissible, the witness' testimony must have been assailed or seriously questioned to the extent that the witness' credibility needs shoring up.

Prior consistent statements are not hearsay because they are not offered for the truth of the matter asserted. Albert R. Neese, No. M2005-00752-CCA-R3-CD, 2006 WL 3831387, at *6. Prior consistent statements admitted to rehabilitate a witness "are not to be used as substantive evidence of the truth of the matter asserted and are to be used only to rehabilitate the witness's credibility." State v. Herron, 461 S.W.3d 890, 905 (Tenn. 2015). Additionally, "upon request, a trial court should instruct the jury as to the limited

- 15 -

purpose for which a prior consistent statement has been admitted." Id. (citing Tenn. R. Evid. 105).

In Albert R. Neese, this court concluded that the trial court did not err by allowing the State to play the victim's video-recorded forensic interview for the jury. Id. at *18. Specifically, this court ruled that the interview was admissible as a prior consistent statement, stating,

> In light of the defendant's assertions of programming the victim by repetitive means, the interview corroborated the victim's testimony at trial. It was effective rebuttal in that the interview occurred during the initial investigation of the complaint before counseling sessions were instituted and prior to the repeated visits to counselors.

Id. Moreover, this court ruled that the evidence was not hearsay and that the trial court properly instructed the jury that the evidence could be considered only to assess the victim's credibility. Id.

The Appellant contends that it was plain error for the State to play the interviews and introduce them into evidence because defense counsel's "mild attack" on the children's credibility did not warrant playing the lengthy interviews; because the children's motives to lie existed before the interviews were conducted; because portions of the children's interviews were "muted," which must have caused the jury to speculate that the children were describing "some very horrible things"; and because the interviews contained information that the children did not testify about at trial. We disagree with the Appellant.

We may only consider an issue as plain error when all five of the following factors are met:

> a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotation marks and citation omitted).

- 16 -

First, the crux of the Appellant's defense was that the children had been coached by their grandmother, their counselors at the CAC, and the prosecutors to lie about the abuse. Early in defense counsel's opening statement, counsel said:

> [A.S., B.S., and C.S.] have been influenced and under the control of their grandmother for the past three years. She was a controlling factor all the family's life for the three years alleged in the indictment.
>
> We're talking about since 2011 to 2014. These are children that are eight -- what? 11, eight, five, and two. . . . And children, you who have children know this. . . . We tell them about Santa [Claus] and the Easter Bunny and fairies. Sometimes there's a vendetta at the house and they start telling the children other stuff like witches and goblins. Horrible things. And they get their mind set on the things that happened to them. They take that out of proportion of making up stories that are reiterated. These children have been talking to their grandmother since 2011. They've been talking to the State. They've been talking to each other. They've been talking to the people at the CAC. And their stories get stronger and stronger and stronger everytime. And they're getting positive feedback everytime to where they may even begin to think it's real.

During defense counsel's cross-examination of the witnesses, counsel continued to challenge the children's credibility. For example, during Rita Philmore's recross-examination, defense counsel asked if Philmore had always wanted custody of the children. During cross-examination of C.S., defense counsel asked if anyone had told her what to say, and C.S. acknowledged that she had talked with a counselor, her sisters, the prosecutors, and her grandmother about the case. During cross-examination of B.S., defense counsel asked who told her to use the word "abuse." On cross-examination of A.S., defense counsel asked, "And [your grandmother] told you what she wanted you to say; right?" Therefore, through defense counsel's cross-examination of the witnesses, counsel repeatedly insinuated that the children had been coached by their grandmother, their counselors, and the prosecutors to fabricate the allegations. Although the Appellant claims that the children's motives to lie existed before the interviews were conducted, part of the defense's theory was that the counselors and the prosecutors coached the children. Thus, the trial court did not err by ruling that the forensic interviews were admissible as prior consistent statements. Moreover, while the trial court did not instruct the jury that it could only consider the interviews for the purpose of assessing A.S.'s, B.S.'s, and C.S.'s credibility, the Appellant did not request such an instruction.

- 17 -

Regarding the "muted" portions of the interviews, the trial court instructed the jury that the redacted portions were not relevant to the case. Generally, we presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Finally, as to the Appellant's claim that the interviews contained information the victims did not testify to at trial, the State presented the redacted versions of the interviews to the defense. The defense had ten minutes and the lunch break to review the redacted interviews. When the parties returned to the courtroom, defense counsel did not contend that she needed additional time to review the redacted interviews and did not argue that further redaction was needed. During counsel's closing argument, she contended that the numerous discrepancies in the interviews supported the Appellant's innocence. Accordingly, we conclude that the Appellant has failed to show that a clear and unequivocal rule of law was breached, that a substantial right of the accused was adversely affected, or that he did not waive the issue for tactical reasons.

## C. Sufficiency of the Evidence

The Appellant claims that the evidence is insufficient to support his conviction of aggravated sexual battery of A.S. because the proof failed to show that he touched her intimate parts "for the purpose of sexual arousal or gratification." In support of his claim, he notes that the State did not present any proof that he made sexual comments to A.S., that he was aroused during the shaving incident, or that his touching A.S.'s vaginal area with his finger was anything but accidental. The Appellant also contends that the evidence is insufficient to support his convictions of child abuse of C.S. because the proof failed to show he inflicted bodily injury. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the

- 18 -

burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Aggravated sexual battery in this case is "unlawful sexual contact with a victim by the defendant," and the victim is less than thirteen years old. Tenn. Code Ann. § 39-13-504(a)(4). "Sexual contact" is defined as "the intentional touching of the victim's . . . intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6).

As stated previously, child abuse occurs when a person knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." Tenn. Code Ann. § 39-15-401(a). "Bodily injury" is defined as including "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2).

Regarding the Appellant's conviction of aggravated sexual battery, the evidence shows that one day when A.S. was ten or eleven years old, her mother told her that the Appellant was going to shave her vaginal area. A.S. went into the bathroom, took the razor from the Appellant, and tried to shave herself so that he would not shave her. The Appellant told her that she "wasn't doing it right," took the razor from her, and began shaving her. A.S. started crying, so the Appellant made her put a towel over her face. He then moved her onto the floor and shaved her while her legs were open. A.S. said she felt the Appellant touch the inside of her vaginal area with his finger.

We conclude that, taken in the light most favorable to the State, a rational jury could have found that the Appellant's touching the inside of A.S.'s vaginal area while he was shaving her was for his sexual arousal or gratification. As this court has explained, the aggravated sexual battery statute "does not require that the appellant become sexually aroused or gratified by the sexual contact. The statute merely requires touching that can

be 'reasonably construed as being for the purpose of sexual arousal or gratification.'" State v. Mahlon Johnson, No. W2011-01786-CCA-R3-CD, 2013 WL 501779, at \*12 (Tenn. Crim. App. at Jackson, Feb. 7, 2013) (quoting State v. Roy Chisenhall, No. M2003-00956-CCA-R3-CD, 2004 WL 12177118, at \*3 (Tenn. Crim. App. at Nashville, June 3, 2004)). The Appellant insisted on shaving his own daughter's vaginal area, and he continued to do so despite the fact that she was upset and crying. He then had her put a towel over her face and moved her onto the floor. He continued to shave her with her legs open and touched the inside of her vaginal area. Borrowing from this court's language in Mahlon Johnson, No. W2011-01786-CCA-R3-CD, 2013 WL 501779, at \*13, these certainly were not actions taken by a father who did not get "some sort of strange sexual gratification" from treating his eleven-year-old daughter in such a manner. Therefore, we conclude that the evidence is sufficient to support the conviction.

As to the Appellant's claim that the evidence is insufficient to support his convictions of child abuse of C.S., the State asked C.S. if the Appellant's hitting her face with the shoe hurt, and C.S. said yes. The Appellant acknowledges that a victim's mere testimony that an incident "hurt" can establish the physical pain component for bodily injury. Nevertheless, he contends that such testimony in this case was insufficient to establish bodily injury because the State did not present medical records or testimony to address C.S.'s physical pain. However, this court has concluded that a victim's testimony that the defendant's stepping on her foot "hurt" was sufficient alone to establish "bodily injury." State v. Mark A. Ammons, No. M2006-00286-CCA-R3-CD, 2007 WL 1790450, at \*9 (Tenn. Crim. App. at Nashville, June 21, 2007). Thus, we conclude that the evidence is sufficient to support the Appellant's convictions of child abuse.

## D. Consecutive Sentencing

Finally, the Appellant contends that the trial court abused its discretion by ordering consecutive sentencing. The State argues that the trial court did not err. We agree with the State.

At sentencing, the State read the children's victim impact statements into evidence. B.S. said in her statement that she was "angry about what he did to us" and that she hoped he "burns to death." C.S. wrote that she was sad about what the Appellant had done, that she wanted "people to hurt him like he hurt us," and that "Sharrad needs to go to jail for many years." Finally, A.S. wrote in her statement that she thought the abuse was her fault and that "[l]iving with this man there was no comfort, no security so that at night I could sleep peacefully and wouldn't have to worry."

According to the Appellant's presence report, the then thirty-four-year-old Appellant dropped out of school after he completed the seventh grade and did not obtain his GED. In the report, he described his mental health as "good" and his physical health as "fair" due to severe hypertension for which he took prescribed medication. The Appellant said in the report that he drank beer occasionally and that he had never used illegal drugs. The Appellant reported the following employment: Church's Chicken for about four weeks in 2017, McDonald's for about six months in 2016, and his brother's home improvement business "off and on" since 2007. The report showed that the Appellant had a 2004 conviction of carjacking and a 2012 conviction of domestic violence.

The trial court applied enhancement factors (1), that the Appellant "has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," and (14), that the Appellant abused a position of private trust, to his sentences. Tenn. Code Ann. § 40-35-114(1), (14). The court found no mitigating factors applicable. The court sentenced the Appellant as follows: twenty-five years to be served at one hundred percent for the convictions of aggravated child abuse of a child eight years of age or less, a Class A felony, in count one and aggravated child neglect of a child eight years of age or less, a Class A felony, in counts five and six; three years as a Range I, standard offender for the convictions of aggravated assault, a Class C felony, in counts two, seven, and eight; twelve years to be served at one hundred percent for aggravated sexual battery of a child less than thirteen years of age, a Class B felony, in count seventeen; and four years as a Range I, standard offender for the convictions of child abuse of a child eight years of age or less, a Class D felony, in counts eighteen and nineteen. The court merged the convictions in counts one, five, and six; two, seven, and eight; and eighteen and nineteen.

In addressing consecutive sentencing, the trial court stated that the Appellant's children needed to be protected from him because "what he did as far as those children are concerned and what their testimony showed was absolutely horrific." In the trial court's written sentencing findings, the court marked on the sentencing form that the Appellant was a "dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." The trial court also marked that "the circumstances surrounding the commission of the offense are aggravated"; that "confinement for an extended period of time is necessary to protect society from the defendant's unwillingness to lead a productive life and the defendant's resort to criminal activity in furtherance of an anti-societal lifestyle"; and that "the aggregate length of the sentences reasonably relates to the offense of which the defendant stands convicted." The court ordered that the Appellant serve the effective twenty-five-year, three-year, and four-year sentences concurrently but that he serve the twelve-year sentence consecutively for a total effective sentence of thirty-seven years.

- 21 -

Appellate review of the length, range, or manner of service of a sentence imposed by the trial court is to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

Consecutive sentencing is appropriate when a defendant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). Our case law clearly reflects that in order to impose consecutive sentencing based upon finding that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and [that] (2) 'the terms are reasonably related to the severity of the offenses.'" State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)); see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

Initially, we note that because we have reversed and vacated the Appellant's convictions in counts one, two, five, six, seven, and eight, his effective sentence for counts seventeen, eighteen, and nineteen is sixteen years rather than thirty-seven years. In addressing consecutive sentencing, the trial court found that the Appellant's children needed to be protected from him. As noted by the State, this court has upheld a trial court's ordering consecutive sentencing when the court found that "the public" included the victim and her children. State v. Robert L. Mitchell, No. M2005-01652-CCA-R3-CD, 2006 WL 1506519, at *16 (Tenn. Crim. App. at Nashville, June 1, 2006). Moreover, the trial court specifically found in its written findings that the Appellant was a dangerous offender and that the Wilkerson factors were applicable in this case. Therefore, we conclude that the trial court did not abuse its discretion by ordering that the Appellant serve the twelve-year sentence in count seventeen and the effective four-year sentence in counts eighteen and nineteen consecutively.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the Appellant's convictions of aggravated child abuse in count one, aggravated child neglect in counts five and six, and aggravated assault in counts two, seven, and eight must be reversed and vacated and the charges dismissed because the indictment failed to provide the Appellant with adequate notice of the offenses charged.  The Appellant's remaining convictions of aggravated sexual battery in count seventeen and child abuse in counts eighteen and nineteen and resulting effective sixteen-year sentence are affirmed.

_____
NORMA MCGEE OGLE, JUDGE